Good morning, Your Honors. Good morning. My name is Debbie Peppi, and I am representing parents and their incredible daughter, who I will continue to refer to as Jess. Now, Jess has Down syndrome, and she has been a student at the Clovis Unified School District since kindergarten until this dispute, which happened in seventh grade, and she had been educated in the general education classes. I would really like to cover three issues here that I think were erroneously decided by the court below. The first one is the credibility determination of Mrs. McVeigh, their inclusion expert. The second one I want to discuss is whether or not the issue of peer-reviewed research was waived. And the third one that I want to discuss is the determination of the Rachel H. factors. Now, concerning the credibility of Mrs. McVeigh, a recent decision in the Sixth Court, the L.H. v. Hamilton County Board of Education, the arguments that they made concerning the credibility of the L.H.'s experts is extremely similar to the arguments made in this case. Counsel, wasn't the ALJ's finding basically that he didn't find Ms. McVeigh's testimony persuasive, including because of what he believed was her general philosophy of inclusion? So whether the philosophy is correct or not, wasn't he basically saying, I just don't find her testimony persuasive? Well, Your Honor, I think one of the problems there is that he maybe did not understand what empirical evidence is. If I may, just a quick example. If you thought you had a fever, okay, and I come up and I check your head and I think, oh, you're warm. You know, maybe you do have a fever. And, Your Honor, as you check his head and someone says, no, he's cold. I don't think he has a fever. Okay, that's one way to say, well, I think my opinion's right, your opinion's wrong. I'm not persuasive because I'm the only one who thinks your forehead is warm. I don't think you have a fever. Yet if we use data, if we use something like if I find a good thermometer and I stick it in your mouth, okay, and then we leave it in there for, I forget how many ever, a minute or whatever, and then if I go up and I read the thermometer, and that's data, that is empirical data, that's data that I am observing, and let's say your temperature, it says, you know, 102. Whoever reads that thermometer here, if everyone read that thermometer here, that thermometer, our observation is going to be the same. It is going to be 102. But, counsel, the ALJ and the district judge wrote exhaustively with regard to the testimony of all of the witnesses and found as a matter of fact that your client would derive no economic benefits from being, I'm sorry, no educational benefits from being in the regular classroom. Even if we had been the finders of fact and would have decided differently, it certainly appears that the opinions are careful and well-reasoned. What basis is there for us to decide that there would have been substantial educational benefits? Your Honor, first of all, whether or not he gained substantial educational benefit based on the seventh and she, I'm sorry, I said he, whether she would gain substantial educational benefits based on the seventh grade curriculum is an incorrect standard. The standard of determining whether a child is gaining evidence or gaining benefit is are they making progress on the goals in the IEP? But, counsel, with respect, let's go back to Ms. McVeigh because that's what you started off with. As my colleague has suggested, the ALJ found her testimony woefully unhelpful. For example, she doesn't really know much about the little girl. Hardly had any time with her at all. The teachers who were with her day after day after day thought this other was better for her. There are actually six reasons. I'm not going to take your time to go through and read them, but the bottom line is that having looked at all of these elements, the ALJ concluded that Ms. McVeigh's testimony simply was not accurate or was given less weight. Let me put it that way than the testimony of the teachers and the others who actually dealt with the little girl. And that's a normal process when you're in an IDEA situation. Somebody has to be the trier of fact, and in this case, it was the ALJ who heard the testimony. Ms. McVeigh could have presented whatever she wanted to within the rules of evidence. She did so. The school district put on its evidence, and the ALJ believed the school district's record. And from what I can read, I can understand that. So back to what my colleague pointed out, again, since that evidence was there and the ALJ made the determination, what is the basis that you would have for our overturning the ALJ's respect to at least Ms. McVeigh's testimony versus the others? Well, specifically concerning Ms. McVeigh's testimony, again, it is basically identical to what the judge in the Sixth Circuit said. And I know that that is not precedent here. But what he was saying was that you're taking an expert and saying to this expert that this expert, because she was not personally familiar with the child, because she did not have the same familiarity with the records of the child, that she could not testify based on her experience. Now, that's not what we've got here. And as you know, Sixth Circuit, we have lots of IDEA cases in this Court. A lot. I've decided 20 or 30 of them myself. So I know this law. And the reality is that in this situation, we're talking about whether the ALJ was more persuaded by what the school district's presentation was than Ms. McVeigh. It's not a question of her not being able to make her presentation. It's simply he didn't credit it as much because there were all these things that didn't make it as helpful. You're a very smart person. It just stands to common sense. If she's not spent any time with their client and the others work with her day after day after day and so on, who's going to know most about her? Your Honor, the next issue, the issue about peer-reviewed research, is basically why the factual determinations about how Jess was performing in school, we don't dispute that. We don't dispute it any more than what you're saying. If I just read this, I would say, no, she's not getting any benefit here. The problem is Ms. McVeigh testified extensively to the fact that her current program and even the program that was proposed, there was not the required amount of aids and benefit that you're talking about. With respect, that was her opinion. She's a learned person, but the reality is the ALJ simply did not credit her testimony versus the school districts to the same degree because the ALJ found otherwise looking at the facts, listening to both parties, or not both, there were lots of people involved here, and found otherwise. You know, you have peer-to-peer review, that's all just great, but at the end of the day, you're talking about this child and what's best for this child, and it all has to go to a trier. In fact, in this case, the ALJ, somebody has to decide. Your Honor, but the ALJ decided that he wasn't even going to consider the aids and accommodations and supports that Ms. McVeigh said just needed in order to be successful. Well, again... I'm sorry. May I use an example? Counsel, before you do that, so I want to make sure I understand your position. Your position is that the ALJ got it backwards, that you can't say that we don't need any supplements here because I found that the curriculum couldn't be modified, that he should have been starting with a presumption of sorts that the curriculum is modifiable in order to have the IEP comply with a congressional mandate, and by doing it in the order he did, he violated the IDEA. Yes, Your Honor, because basically it's stated very plainly within the IDEA that a student cannot be removed from the general education class merely because of the needed modifications to the curriculum. And the standard that they judged Jess's performance on was her ability to keep up with the seventh grade curriculum. And if that were the criteria in your view, basically there would be no students like Jess who would be in the least restrictive environment? Oh, no, Your Honor. I believe that basically, in fact, that came up with the introduction of what's called the CCCs, the Common Core Connectors, and even another resource that their counsel presented, that there is research, and it's on the California Department of Ed's website, for how to modify the seventh grade curriculum where you are still teaching to seventh grade standards, but the achievement standards are changed, what you're teaching, how you're teaching, how you're delivering it. This is one of the biggest areas of lack of training within the whole field of inclusion. But if it was not available to modify the seventh grade curriculum down to a level where students with severe cognitive disabilities couldn't access and be productive within that wouldn't exist, and it wouldn't be on the California Department of Ed's website. And we introduced that evidence plainly, and we talked about that, just to show that this is on the California Department of Ed's website, that there is material there. I think you wanted to save some time. Oh, I'm so sorry. Okay. Whatever you want to do. All right. Please let me get into the Rachel H. factors quickly, and then hopefully I'll still have about a minute to say. The Rachel H. factors, the first one about academic benefit, again, that was decided wrongly, and it states it plainly in L.H. versus Hamilton Department of Education that was decided after the brief, that was decided in August of this year. They based the standard on how that little boy had accessed the grade-level curriculum, not the goals that are in his IEP. The goals that are in a child's IEP are the goals that have been determined individually to meet her needs. And that, based on the goals, that is how you determine whether or not there's educational benefit. Not whether she could access the seventh grade unmodified or poorly modified curriculum, but whether she was meeting her goals. And she clearly met 40 percent of those goals. It says so right in the beginning of the district court decision. It says she met 40 percent of her goals. She was getting academic benefit out of that. And I'll save my minute for rebuttal. Thank you. Good morning, Your Honors. May it please the Court. Sloan Simmons on behalf of Appellee-Clovis Unified School District. I think Your Honors are looking at this case, at least initially, as the correct starting point, which is, as you're well aware, having done a voluminous number of IDEA cases, is that when the ALJ's underlying decision is thoughtful and careful, the district court then needs to give that careful analysis due deference. Which, in fact, here, after a four-day hearing and 13 witnesses and 600 pages of documentary evidence, the ALJ produced a 33-page decision which thoughtfully goes through each of the witnesses' substantive testimony, analyzes each of the legal issues, juxtaposed or applying that testimony, which the ALJ took, including specific determinations stated expressly in the ALJ's decision as to the persuasiveness and credibility and weight. Counsel, the ALJ said that Ms. McVeigh wasn't persuasive in part because of her general philosophy of inclusion. It seems to me that Congress embodied a general philosophy of inclusion in the IDEA itself. What is wrong? Why didn't the ALJ err when he rejected her testimony, in part because of a philosophy that underlies what the Congress-mandated school districts like yours follow? Your Honor, very good question. A couple of responses to that. First, you are right that the IDEA's goal, and Andrew F., the court talks about this, the expectation is that this idea that we will have full inclusion, that's our goal. But it's also not unflexible. And, in fact, 20 U.S.C. 1412A5A, as well as the regs that implement that provision, 34 CFR 300.114 and 115, talk about the fact that mainstream may be our goal, but it's not inflexible. And there needs to be a continuum of placement options and services provided. What the ALJ really took issue with here was not the general philosophy of inclusion, but, in fact, two primary things. The concept from Ms. McVeigh that full inclusion was always and absolutely what should be applied to each student, including a student like that at issue here, who, if we go through all of the court's cases on LRE, or at least the ones that I think most closely reflect what you are looking at here today, whether it's the Poolaw case, the Catherine G. case, the KM case, the Garden Grove case, the facts in those cases all involve a very perhaps arguably close call, a student at one grade level performing a grade or two below. In this instance, we had a student who was 14 years of age performing between a kindergarten and first grade level. And so when the ALJ is being told in terms of his evaluation of Ms. McVeigh's testimony, and having never witnessed her in class or the other list of factors which the court has identified, the ALJ specifically points out that all Ms. McVeigh had seen is her records. But, counsel, I mean, based on what I look at and what the ALJ found, basically anyone with Down syndrome with an IQ of around 40 like Jess would never be in a least restrictive alternative in your school district because of the view that the curriculum can't be appropriately modified. How does that comply with the IDEA? Right, and, Your Honor, I disagree with that proposition. First, keep in mind, this was a blended offer of fate. This program, which the ALJ found was appropriate, would not have had the student in a special day class 100% of the time. It was for 42% of the time, while 58% of the time the student was going to be engaged with non-disabled peers. Like lunch and research? No, and... Elective classes? Yeah, elective classes, physical education. What sort of elective classes was she in the general education setting? At the time, or what was being proposed under the IEP, which was that issue in the case, Your Honor? I mean, her... Things like art and music, she would be in the general setting. Right, so, for example, and it's separate from right now, right now her elective classes are art and choir and physical education, those types of courses. But, again, if we're looking at time, it's a blended program. The concept that she was being moved away, she was staying at the Caster campus, and she would be placed in the special day class with like peers performing at that same level between kindergarten and third grade. And so the response to your question, Your Honor, is that the district's not saying that no student with Down syndrome can never be in a general education class. What we're aiming for and consistent with Andrew F. is how can we make appropriately ambitious goals for her to gain both academically and socially, which the court found in this IEP was designed specifically to do that based upon testimony from nine individuals who were involved as her resource specialists, her psychologists. Who said she couldn't benefit from general education classes? Who said, based upon the testimony from the witnesses, that at that point in time, her enrollment in a seventh grade general history and science course was not providing her educational or social benefit. That, in fact, she had been regressing. And that the curriculum, according to the school district, could not be modified. That it was impossible to modify the curriculum in the general education classes to be appropriate for her. Your Honor, I think that isn't entirely accurate. And that what the testimony says that they, in fact, did through coordination with the district's special ed administrators, Ms. McLean and her science teacher, in fact, did work on modifying the curriculum so that it could be appropriate and effective for her in the course. But looking at how she was progressing, that that modification based upon the student's unique needs in this case, it's very important, this is not a blanket proposition. And nor are we as the district, in this case or otherwise, suggesting that this is the automatic program or the automatic outcome that would result in every instance. In fact, an IEP means an individual assessment, right? Absolutely, Your Honor. Yes, the statute has the overall intention. Yes, that's the goal. Yes, you try to push it that way. But the reason you have these assessments based on the child is because you want to see what that individual child's needs are. It's not just a statutory thing. And in this case, I gather the district's position is that that is what you tried to do, was to meet the needs of the child. You had a blended program where she was part of the general population, I think you said 58%. Yeah, the proposed IEP that was rejected was 42% in the special day class, 58% with non-disabled peers. So, yes, there's an attempt to blend as much as possible. But unfortunately or fortunately, the way it is, parents have certain expectations that they would like. So I want them to go to private school. And they do everything they can to try to get that done. But in this case, you have people who cared for her, just like the parents cared for her. They looked at the IEP. They did what they thought was required here. The ALJ heard the testimony of everybody concerned, concluded that they were, in fact, complying with the law. And the district court, after reviewing the evidence, concluded the same. Is that basically what we've got here? Absolutely, Your Honor. And returning to the idea of the factors which the ALJ took into consideration in Wayne, Ms. McVeigh's testimony versus the district's nine witnesses, I would point the court to Catherine G. And there was a similar analysis, a district court case, but a full analysis of the racial age factors. And it was there that the district court reached a similar conclusion, that when there's an unflexing theory of inclusion, which is not accounting for the offered program for a student based upon the individualized needs and the evidence which is actually before the court and the ALJ, that can be a factor which makes that recommendation or opinion less credible. And so I think you really do need to look at this program and the totality of the evidence and the record. And I think in doing that, the ALJs and district courts balancing in weight of Ms. McVeigh's testimony, especially in light of the absence of direct contacts and abilities to see the student. Not just the lack of observation, but also the inaccuracy as to what the student, the child was really capable of or how she actually performed in the classroom too, right? Correct, Your Honor. That was the basis for the finding that Ms. McVeigh's testimony was not as persuasive. Right. I mean, in fact, one of the examples raised in Appellant's opening brief was Ms. McVeigh describing a typical day, which would have included, in her view, the student doing online research. And based upon the testimony of the district's witnesses, it just wasn't going to be for this particularized student and their unique needs something that was going to occur. I think this perhaps doesn't need addressing, but I would say again, consistent with our letter that we submitted in response to the supplemental authority, that the L.H. case, in our view, has no bearing here. Facts are different. Analysis and tests in the Sixth Circuit is different. And otherwise, would request that based upon the court's existing authority and the record in this case that you affirm the district court in full. Thank you, counsel. Any other questions? No. I think not. Thank you. So we have a little rebuttal time, counsel. Your Honor, first, and I'll say this quickly. If every one of those teachers testified that they could not modify the curriculum, you have to understand this curriculum was incorrectly modified. The way the science teacher would modify the curriculum for Jessica as far as tests, she gave her the same test questions that the regular seventh grade students got, but gave her less. And that's not correctly modifying the curriculum down to her level. You're saying that the way they purported to modify the curriculum predetermined the outcome? Yes. They tried. They have not been trained. They all admitted that they really had not been trained. They tried their best. And I believe that they genuinely feel that an SDC class would be better for her. But unfortunately, research and parents genuinely feel and they see that she is gleaming knowledge from this. Like, she comes home, she talks about DNA. She talks about microscopes. And the fact that if you say that this little girl who they say could sit down and copy words and access to the Internet is one of the accommodations in her IEP, that she couldn't sit down at the computer and type in the word, like, warm, like the example, and push the enter button and some pictures come up, and then she could use pictures of warms while the rest of the class is talking about the actual text and nematoids or whatever. But there are correct ways, and it is done, and inclusion has been proven, and it is what Congress, it's their presumption. It is what Congress wants. And I think we have your argument. Do we have additional questions? No. All right. Thank you both for your argument. You're very welcome. We appreciate it. We appreciate that this is a human being, little girl we're talking about. We're very mindful of that. We will make a decision as soon as we can. The case just argued is submitted, and the court stands in recess for the day. Thank you.
judges: M. Smith, Nguyen, Bennett